**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Julia K. Venditti (State Bar No. 332688)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          jvenditti@bursor.com
          jwilner@bursor.com
          jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES TOTTEN, individually and on behalf of all other persons similarly situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>BOBA GUYS INC.,<br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff James Totten ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Boba Guys Inc. ("Defendant" or "Boba Guys"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiff brings this class action lawsuit on behalf of himself and other similarly situated consumers who purchased Defendant's drinks, including but not limited to Boba Guys-branded products containing tea and boba pearls (the "Products")[1], which are misleadingly marketed as "next level quality" and "free of artificial ingredients" despite containing high levels of plastic chemicals—namely, bisphenol A, a toxic ingredient used to make plastics harder.

2.    Defendant owns and operates Boba Guys, a boba tea company with dozens of brick-and-mortar stores across California and New York City. Defendant assures its customers that it offers "#NEXTLEVELQUALITY," which, according to Defendant, means its "drinks are free of artificial ingredients and created only from the best ingredients[,]" including the purportedly "all natural brown sugar based sweetener" incorporated in "all of [its] milk teas":[2]



---

[1] Discovery may reveal that additional of Defendant's products are within the scope of this Complaint. Accordingly, Plaintiff reserves the right to include additional items identified through the course of discovery.

[2] Boba Guys, *Next Level Quality*, *available at* https://www.bobaguys.com/nextlevelquality (last accessed Mar. 27, 2025); *see also* Boba Guys, *FAQ*, https://www.bobaguys.com/faq ("We are committed to serving our guests high quality drinks ….").

What does **#nextlevelquality** mean? It means that our drinks are free of artificial ingredients and we never use powders. Our products are created only from the best ingredients we could source. From our Grade A balls to our handshaken froth, we put care, thought and an immense amount of love into every aspect of our drinks. Here's the



3.     The "Next Level Quality" advertisements also appear in each of Defendant's brick-and-mortar stores, in large signage prominently located by nearby the cash registers, as shown in the screenshots below:





4.      Unfortunately for consumers, however, recent third-party testing revealed that the Products contained, or risked containing, high levels of toxic, bisphenol A ("BPA"),[3] a chemical on California's Proposition 65 list that must be disclosed when present because of its known reproductive toxicity.  Indeed, in one instance, Defendant's Product was ***more than 32,000% above*** what the European Food Safety Authority deems safe for BPA consumption.  The amounts found were also higher than California's maximum allowable dose of dermal BPA exposure, which is 3 micrograms per day, lower than the European Food Safety Authority's safe level.

5.      BPA is an endocrine-disrupting synthetic compound used to produce polycarbonate plastic and is "harmful to human health through different molecular mechanisms."[4]  BPA has also been liked to reproductive and developmental toxicity.[5]  Additional studies have shown BPA's association with cancer,[6] hormonal disruption,[7] and infertility,[8] among other conditions.  Moreover, numerous studies indicate that, <u>even at low levels</u>, exposure to BPAs is harmful to human health.[9]

---

[3] *See* PlasticList Report, PlasticList (Dec. 27, 2024) https://www.plasticlist.org/report, (hereinafter, "2024 PlasticList Report") ("We collected 775 samples of 312 foods and sent them to our chosen lab…We tested each sample for 18 different chemicals, also called analytes…We detected plastic chemicals in 86% of the foods we tested.").

[4] Ilaria Cimmino, et al., *Potential Mechanisms of Bisphenol A (BPA) Contributing to Human Disease*, 21(16) Int J Mol Sci. (2020), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7460848/pdf/ijms-21-05761.pdf.

[5] *See* Melody N. Grohs, et al., *Prenatal maternal and childhood bisphenol a exposure and brain structure and behavior of young children*, 18(85) Environ Health 1, 5 (2019), *available at* https://doi.org/10.1186/s12940-019-0528-9 (claiming that brain changes caused by BPA exposure during pregnancy directly explain behavior problems in children: "[T]he relationship of prenatal maternal BPA and internalizing behavior [a psychiatric term referring to inward-directed behaviors like anxiety, depression, social withdrawal, and low self-esteem] … demonstrated by a significant indirect effect.").

[6] *See* Haixing Song, et al., *Low doses of bisphenol A stimulate the proliferation of breast cancer cells via ERK1/2/ERRγ signals*, 30 Toxicol Vitro. (2015), https://pubmed.ncbi.nlm.nih.gov/26363202/.

[7] *See* Johanna R. Rochester, et al., *Bisphenol S and F: a systematic review and comparison of the hormonal activity of bisphenol A substitutes*, 123(7) Environ Health Perspect. 643-50 (2015), https://pubmed.ncbi.nlm.nih.gov/25775505/.

[8] *See* John D. Meeker, et al., *Urinary bisphenol A concentrations in relation to serum thyroid and reproductive hormone levels in men from an infertility clinic*, 44(4) Environ Sci Technol. 1458–63 (2010), https://pubmed.ncbi.nlm.nih.gov/20030380/.

[9] *See* Sofia Almeida Costa, et al., *Association between bisphenol A exposure and cardiometabolic outcomes: A longitudinal approach*, 476 J. Hazard. Mater 1, 8 (2024), *available at* https://doi.org/10.1016/j.jhazmat.2024.135000 ("The present study answered some uncertainties raised in the past years regarding the assessment of exposure to BPA …. Thus, **the need to**

---

6.      Critically, Defendant has acknowledged that the source of the contamination is the brown sugar used in its drinks.[10]  Further, according to Defendant, brown sugar is used in "all of [its] milk teas."[11]  Thus, the BPA contamination is widespread throughout all Boba Guys-branded Products containing Defendant's purportedly "all natural" brown sugar based sweetener.

7.      Yet, Defendant did not warn consumers of the unreasonable risk associated with consuming its Products.  Because of this unreasonable safety hazard posed by its Products' contents, Defendant had a duty to warn its consumers of the potential risk of consuming its Products.

8.      Moreover, in light of the Products' BPA content, the Products are not, in fact, "free of artificial ingredients"; they do not, in fact, feature "only [] the best ingredients" or "only … the finest ingredients"; and the BPA-contaminated brown sugar in the Products is not, in fact, "all natural," and nor is it of "next level quality" (collectively, the "Health Claims"), as Defendant has claimed in connection with its widespread and uniform "Next Level Quality" marketing campaign and advertisements.  Accordingly, Defendant's Health Claims are false, misleading, and highly deceptive to reasonable consumers.

---

globally reduce BPA daily exposure [is] urgent, since adverse health effects are expected when exposure chronically exceeds safety levels, even at low doses.") (emphasis added); *see also* U.S. Right to Know, *Even at low levels, early bisphenol A (BPA) exposure is hazardous to later health, study shows* (Nov. 14, 2024), https://usrtk.org/healthwire/early-bisphenol-a-bpa-exposure-is-hazardous-to-health/ ("Early exposure to bisphenol A (BPA) may increase your risk of developing conditions such as heart disease, stroke, type 2 diabetes, and obesity later in life, even in small doses, a recent study has found. ….").

*See also, e.g.*, Genoa R. Warner, et al., *Bisphenol A and Phthalates: How Environmental Chemicals Are Reshaping Toxicology*, 166(2) Soc. Toxicol. 246, 246-47 (2018), *available at* https://doi.org/10.1093/toxsci/kfy232; Sheryl E. Arambula, et al., *Impact of Low Dose Oral Exposure to Bisphenol A (BPA) on the Neonatal Rat Hypothalamic and Hippocampal Transcriptome: A CLARITY-BPA Consortium Study*, 157(10) Endocrinol 3856 (2016), https://doi.org/10.1210/en.2016-1339; Frederick S vom Saal, et al., *An Extensive New Literature Concerning Low-Dose Effects of Bisphenol A Shows the Need for a New Risk Assessment*, 113(8) Environ Health Perspect. 926 (2005), *available at* https://ehp.niehs.nih.gov/doi/10.1289/ehp.7713.

[10] *See* Boba Guys, *BPA Questions*, https://www.bobaguys.com/bpaquestions ("Receipt/thermal printer paper, and brown sugar (used to make our housemade syrups), both of which were purchased off-the-shelf from third parties, had slightly elevated levels of BPA.  We believe these to be the likely sources of BPA found in the boba analyzed by PlasticList.org in its initial study.") (emphasis added).

[11] Boba Guys, *Next Level Quality*, *supra* note 2.

9.      By prominently featuring the Health Claims on Defendant's website, in large signage at its brick-and-mortar store locations, and in other marketing materials for the Products, Defendant intends to induce consumers to pay more than they would pay for other comparable products that are not falsely marketed with Health Claims, and consumers are so induced as a result of these claims.  Thus, although the Products have been a marketing sensation and a financial success, Defendant's success has been the result of fraudulent, unlawful, and unfair business practices in the marketing and sale of the Products.  Defendant's misleading representations and unfair business practices described herein are plainly improper and unacceptable—particularly for a company that touts its "commitment to excellence … in [its] products,"[12] assures consumers that they "can count on Quality,"[13] and claims its "products are created only from the best ingredients,"[14] among other things.[15]

10.      Further, Defendant sold the Products at inflated prices as a result of its false representations, omissions, and concealment of the true qualities of the Products.  Indeed, in response to the question, "why are your drinks so expensive?", Defendant acknowledges that its "drinks are 10-30% more than the average boba shop" because, according to Defendant, its purportedly next level quality "ingredients cost a lot more.  Premium teas, housemade syrup, and Straus organic milk are expensive."[16]  Defendant further asserts that competitor boba shops "us[e] cheaper ingredients" and "have lower food service standards and sketch business practices that help with driving down costs."[17]  Thus, the price Plaintiff and Members of the Classes paid for the

---

[12] Boba Guys, *FAQ*, *supra* note 2.

[13] *Id*.

[14] Boba Guys, *Next Level Quality*, *supra* note 2.

[15] *See also* Boba Guys, *FAQ*, *supra* note 2 ("We promise our guests that we will always stand for quality, transparency, and doing the right thing.").

[16] *Id*. (emphasis added).

[17] *Id*. ("WHY ARE YOUR DRINKS SO EXPENSIVE?  *Yes, **our drinks are 10-30% more than the average boba shop, so we'll cut to the chase: our ingredients cost a lot more**.  Premium teas, housemade syrup, and Straus organic milk are expensive. … Also, … [competitor boba shops that use] cheaper ingredients … have lower food service standards and sketch business practices that help with driving down costs. … [W]e're not saying all boba places who use cheap ingredients are bad.  **Like in anything, you get what you pay for**. … We promise our guests that we will always*

toxic BPA-containing Products they ultimately received was the price for a tea and/or boba pearl product that contains "all natural brown sugar based sweetener" and is otherwise "free of artificial ingredients." In other words, Plaintiff and class Members paid a price premium for the Products as a direct result of Defendant's false, misleading, and deceptive Health Claims.

11.     For the foregoing reasons, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for: (i) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (ii) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; and (iv) unjust enrichment / restitution.

## **PARTIES**

12.     Plaintiff James Totten is a natural person and a citizen of California who resides in Hollister, California. In or around June 2024, Plaintiff purchased a Korean Banana Milk drink with boba pearls in Defendant's brick-and-mortar shop located on Santana Row in San Jose, California. In making his purchase, Plaintiff had no reason to believe that the Product contained, or risked containing, in a single serving, unsafe levels of BPA. Indeed, Plaintiff did not believe the Product could be harmful and he was not aware at the time of purchase that the Product contained, or risked containing, unsafe levels of toxic BPA. Additionally, Defendant failed to adequately disclose or warn Plaintiff and other consumers about the BPAs in the Product or of the numerous and severe health risks associated with exposure to BPAs at any dose or level. A warning on the Product's packaging or prominently displayed in Defendant's brick-and-mortar shops near the registers would have corrected Plaintiff's erroneous belief. Had Plaintiff known that Defendant's Products contained, or risked containing, unsafe levels of toxic BPA, he would not have purchased it. Furthermore, prior to his purchase, Plaintiff reviewed in-store advertisements and marketing materials concerning the Products and saw the false and misleading Health Claims that, among

---

*stand for quality, transparency, and doing the right thing. ….")* (italics in original, bolding and underlining added for emphasis).

other things, the Products are purportedly "next level quality," which were prominently displayed by the register. Plaintiff understood these claims to be representations and warranties by Defendant that the Products are healthy and free of all traces of toxic ingredients or contaminants and do not expose consumers to toxic chemicals or contain any ingredients that are harmful to human health. Plaintiff reasonably relied on Defendant's Health Claims in deciding to purchase the Product, and these representations were part of the basis of the bargain in that he would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known. Thus, as a direct result of Defendant's material misrepresentations and omissions, Plaintiff suffered, and continues to suffer, economic injuries.

13.    Plaintiff continues to desire to purchase the Products from Defendant in the future. However, Plaintiff is unable to determine whether Defendant's drinks contain BPAs (and if so in what amounts) or are actually "free of artificial ingredients" as marketed and/or safe for consumption. Plaintiff understands that the composition of the Products may change over time. But unless and until Defendant is required to verify, test, affirm, or otherwise ensure that the Product is BPA-free, Plaintiff and the Classes he seeks to represent would have no way to ensure that Defendant's Products do not expose them to potentially severe health risks. Similarly, as long as Defendant may use the phrase "free of artificial ingredients" to describe the Products and/or "all natural" to describe the Products' ingredients, and the Products contain BPAs—which *are* "artificial" and *are not* "all natural"—then when presented with false or misleading information when shopping, Plaintiff will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Product and competitor's Products. Plaintiff is further likely to repeatedly be misled by Defendant's conduct, unless and until Defendant is compelled to disclose that the Products contain BPAs and/or ensure that Products marketed and advertised as "free of artificial ingredients" and "all natural" in fact contain high levels of artificial, non-natural, and highly toxic BPAs.

14.    Defendant Boba Guys Inc. is a California company with its principal place of business in Brisbane, California. Defendant owns and oversee the operations of Boba Guys and

produces, manufactures, markets, and sells tea drinks with boba pearls throughout California and the United States.

15.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act ("CAFA"), because there are more than 100 class Members, at least one Class member is a citizen of a state different from Defendant, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs.

17.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in California, rendering it "essentially at home" in this State. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  In addition, this Court has specific personal jurisdiction over Defendant because Defendant purposefully availed itself of the benefits of this District by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District, including Defendant's sale and Plaintiff's purchased of the Products in this District.

## FACTUAL ALLEGATIONS

### A.     Defendant's Business And The False And Misleading Health Claims

19.     Boba Guys was founded in 2011 and has quickly grown into one of the country's largest boba tea chains.   Boba Guys operates stores across California and has locations in New York City.

20.    Boba Guys primarily sells different forms of boba teas.  Boba generally refers to the tapioca balls that rest at the bottom of the cups.  The tapioca is generally made from water, potato starch, brown sugar and tapioca starch.  When mixed with water, tapioca starch has a tender and supple texture, which makes it easy to chew.  The dark caramel-brown hue of boba comes from brown sugar, which is rolled in together with the starches.



21.    Boba's popularity has surged in the United States.  Indeed, a 2021 consumer survey found that 94% of people aged 20-29 had bought boba tea within three months of that survey—a trend that was not impacted by the pandemic despite the overall impact to restaurants generally.

22.    Defendant touts its use of high-quality ingredients in its advertising and marketing of the Products:[18]

**WHAT WE STAND FOR**

QUALITY: A HIGH BAR FOR EVERYTHING WE DO

It is our commitment to excellence, not only in our product, but in our service. It is the result of intelligent effort built on a foundation of repetition and consistency. Anyone can deliver a good experience once-- we strive to do it every moment.

You can count on Quality. It's reliable like a best friend or parent. It's comfortable like home. And most importantly, it's the measure of success. We all want Quality, not quantity.

Click here to read all about our #NextLevelQuality

---

[18] *See* Boba Guys, *Our Mission*, https://www.bobaguys.com/new-page (last accessed Mar. 27, 2025) ("QUALITY: A HIGH BAR FOR EVERYTHING WE DO[.] It is our commitment to excellence, not only in our product, but in our service. … You can count on Quality. … Click here to read all about our #NextLevelQuality") (underlining denotes hyperlink).

23.     Further, as noted above, Defendant assures its customers that it offers "#NEXTLEVELQUALITY," which, according to Defendant, means its "drinks are free of artificial ingredients and created only from the best ingredients[,]" including the purportedly "all natural brown sugar based sweetener" incorporated in "all of [its] milk teas":[19]





24.     The "Next Level Quality" advertisements also appear in each of Defendant's brick-and-mortar stores, in large signage prominently located by nearby the cash registers, as shown in the examples from the screenshots below (red markings added for emphasis):

_____
[19] Boba Guys, *Next Level Quality*, *supra* note 2.











25.    To make matters worse, Defendant prominently features in the window—on at least its Santana Row storefront where Plaintiff purchased his Product—that its Products contain "All-natural ingredients," as shown below (red markings added for emphasis):



26.    Defendant thus prominently markets of the Products as "next level quality" in that, *inter alia*, they contain "all natural" ingredients and are "free of artificial ingredients" (collectively, the "Health Claims").

27.    As Defendant acknowledges on its website, as a direct result of Defendant's Health Claims, Defendant is able to sell its Products at a premium price as compared to competitors that sell tea and boba pearl drinks containing cheaper and/or lower-quality ingredients.[20]

---

[20] *See* Boba Guys, *FAQ*, *supra* note 2 ("WHY ARE YOUR DRINKS SO EXPENSIVE? *Yes, our drinks are 10-30% more than the average boba shop, so we'll cut to the chase: our ingredients cost a lot more. Premium teas, housemade syrup, and Straus organic milk are expensive. ... Also, ... [competitor boba shops that use] cheaper ingredients ... have lower food service standards and sketch business practices that help with driving down costs. ... [W]e're not saying all boba places who use cheap ingredients are bad. Like in anything, you get what you pay for. ... We promise our guests that we will always stand for quality, transparency, and doing the right thing. ....")* (italics in original, bolding and underlining added for emphasis).

**B.      Bisphenol A ("BPA")**

28.      In December 2024, PlasticList, a consumer-led independent research project tested 312 foods for plastic-related chemicals.[21]  The researchers relied on a lab with "extensive experience in food testing, and [secured] the assistance of excellent analytical chemists and epidemiologists who educated [them] and tried to ensure that [their] work met a high bar of accuracy and transparency."[22]

29.      The group tested for both phthalates and BPA,[23] plasticizers traditionally added to plastics to make them more flexible and durable.[24]  But in the 1990s, there was a major push to replace these chemicals with safer alternatives.[25]

30.      Plastic chemicals "readily leach"[26] into surrounding surfaces, including food.  In humans, BPA is endocrine disrupting chemicals that have a variety of adverse health effects.  "The unique properties of BPA [], including low dose effects, nonmonotonic dose response curves ('NMDRCs') and quick metabolism, disobey traditional principles of toxicology."[27]  In other words, BPA is harmful at even low levels.

31.      The adverse health impacts related to plastic chemicals include disruptions of the endocrine, respiratory, and nervous systems.[28]  Indeed, for well over two decades, physicians,

---

[21] Newsweek, *Foods with the Most Plastic Chemicals: Study Reveals Surprising Results*, Newsweek (published Dec. 30, 2024; updated Jan. 2, 2025), https://www.newsweek.com/foods-most-plastic-contamination-phthalates-study-2007473.

[22] PlasticList, *supra* note 3.

[23] *Id.*

[24] Consumer Reports, *What's the Difference Among Microplastic, Phthalates, BPA, and PFAS?"* *Consumer Reports* (May 29, 2024), https://www.consumerreports.org/toxic-chemicals-substances/microplastics-phthalates-bpa-pfas-a1059022044/ (last accessed March 11, 2025).

[25] PlasticList Report, PlasticList (Dec. 27, 2024), https://www.plasticlist.org/report.

[26] Genoa R. Warner, et al., *Bisphenol A and Phthalates: How Environmental Chemicals Are Reshaping Toxicology*, 166(2) SOC. TOXICOL. 246, 246-49 (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6260148/.

[27] *Id.* (citing Laura N. Vandenberg, et al., *Hormones and Endocrine-Disrupting Chemicals: Low-Dose Effects and Nonmonotonic Dose Responses,* ENDOCRINE REVIEWS 33, 1 (2012), https://academic.oup.com/edrv/article-abstract/33/3/378/2354852).

[28] Yufei Wang, et al., *Phthalates and Their Impacts on Human Health*, 9 (5) HEALTHCARE (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8157593/pdf/healthcare-09-00603.pdf

---

researchers, and public health experts have expressed deep concern about human exposure to BPA.[29]

32.    BPA is an industrial chemical that has been used to make certain plastics and resins.[30]  Most commonly, BPA is found in polycarbonate plastics, which are often used in containers that store food and beverages (*e.g.*, water bottles), and epoxy resins used to coat the inside of metal products like food cans, bottle tops and water supply lines.[31]  However, "research has shown that BPA can seep into food or beverages from containers that are made with BPA."[32] "BPA is a known endocrine disruptor," and BPA exposure in humans has been associated with "adverse perinatal, childhood, and adult health outcomes, including reproductive and developmental effects, metabolic disease and other health effects."[33]



**Figure 1** [34]

---

[29] Breast Cancer Prevention Partners, Blog Post: *How Much Exposure to BPA is Safe?* (Apr. 25, 2024), https://www.bcpp.org/how-much-exposure-to-bpa-is-safe/.

[30] *See* Johanna R. Rochester, *Bisphenol A and human health: A review of the literature*, 42 REPROD. TOXICOLOGY 132-155 (2013), https://doi.org/10.1016/j.reprotox.2013.08.008.

[31] *See* Brent A. Bauer, *What is BPA, and what are the concerns about BPA?* Mayo Clinic (Mar. 24, 2023), https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/expert-answers/bpa/faq-20058331.

[32] *Id.*

[33] Johanna R. Rochester, *Bisphenol A and human health: A review of the literature*, 42 REPROD. TOXICOLOGY 132-155 (2013), *supra* note 30; *see also* Mayo Clinic, *What is BPA, and what are the concerns about BPA?* (Mar. 24, 2023), https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/expert-answers/bpa/faq-20058331 ("Exposure to BPA is a concern because of the possible health effects on the brain and prostate gland of fetuses, infants and children. It can also affect children's behavior. Additional research suggests a possible link between BPA and increased blood pressure, type 2 diabetes and cardiovascular disease.").

[34] *See* European Environment Agency, Briefing: *Human Exposure to Bisphenol A in Europe* (Sep. 14, 2023), *available at* https://www.eea.europa.eu/publications/peoples-exposure-to-bisphenol-a (last accessed March 11, 2025).

---

33.     Moreover, increasing data suggests that there is an association between BPA levels and tumor development including prostate, breast, and lung cancer.[35]

34.     And although "[a] safe harbor level for oral exposure to BPA has not been published … companies will be required to develop an oral MADL for BPA to determine if warnings are needed for their products.  If a company is unable to derive an [maximum allowable daily limit] for BPA exposure, the options are to remove BPA from any products or use a Prop 65 warning."[36] Defendant never did so.

### C.     Defendant's Products Contain High Levels of BPA

35.     PlasticList tested nine of Defendant's drinks.  It found each contained levels of BPA vastly above what is considered safe.  The findings ranged from 1,737.1% to 32,571.4% above what the European Food Safety Authority deems a safe level of BPA consumption.  ***Stunningly, the highest finding was equivalent to consuming 1.2 years' worth of BPA if consumed at a safe level.***[37]

36.     This finding is contrary to the representations throughout Defendant's brick-and-mortar shops claiming it sells "quality" products.  Indeed, Defendant markets and sells all its Products in the same way.  Each is comprised of the same base ingredients which use its "perfect ***all natural*** brown sugar based sweetener for all of [its] milk teas."[38]  Accordingly, each milk tea with boba pearls sold by Defendant is substantially the same.

37.     Thus, unfortunately for consumers, and despite Defendant's representations that its Products are made with "NEXTLEVELQUALITY" ingredients, "free of artificial ingredients," and are "all-natural" (discussed above), the Products contain, or risk containing, high levels of toxic BPA.

---

[35] *See id.*

[36] Intertek, *U.S. – California Prop 65 Bisphenol A (BPA) Warning Label Requirement* (May 13, 2016), *available* https://www.intertek.com/products-retail/insight-bulletins/2016/prop-65-bpa-warning-label-requirement/.

[37] *See* PlasticList Report, *supra* note 3.

[38] Boba Guys, *Next Level Quality*, *supra* note 2 (emphasis added).

38.    Notably, Defendant has admitted, in a statement buried on a discrete page of its website, that the BPA contamination of its Products was occurring through in its receipt paper and brown sugar.[39]  However, Defendant did not disclose this material information to Plaintiff and Class Members in any prominent disclosure prior to their purchases of the Products here or otherwise warn consumers of the unreasonable health risk that would result from their consumption of the BPA-containing Products.  Defendant was aware of the contamination and, as such, had an affirmative duty to disclose this material information because of the unreasonable health risk associated with such high BPA amounts.  Yet, it failed to do so.

**D.    Defendant's Material Misrepresentations And Omissions**

39.    Defendant manufactures and/or sources the ingredients for its Products.  Thus, Defendant is, or should be, acutely aware of the quality and contents of its ingredients, including the risk of BPA.  Indeed, Defendant admitted to PlasticList that it had identified the source of its BPA contamination: its brown sugar.

40.    Despite this knowledge, Defendant failed to disclose to its consumers that its Products contained, or risked containing, hazardously high levels of toxic BPA that exceed by 32,000% safe consumption amounts.  On information and belief, Defendant has still not affirmatively disclosed to its consumers that their purchases exposed them—or risked exposing them—to high levels of BPA, despite being on notice since at least December 2024.

41.    Plaintiff and Class Members relied on Defendant's omissions and its representations of "all natural" ingredients and "NEXTLEVELQUALITY" claims and reasonably expected Defendant's Products to be free from high levels of toxic BPA.  Plaintiff and Class Members would have paid substantially less for the Products or would not have purchased the Products at all had they known that the Products contained, or risked containing, hazardous levels of toxic BPA.  Therefore, Plaintiff and the Classes were injured by the price premium they paid for the Products,

---

[39] *See* Boba Guys, *BPA Questions*, *supra* note 10 ("Receipt/thermal printer paper, and brown sugar (used to make our housemade syrups), both of which were purchased off-the-shelf from third parties, had slightly elevated levels of BPA.  We believe these to be the likely sources of BPA found in the boba analyzed by PlasticList.org in its initial study.") (emphasis added).

which they otherwise would not have paid absent Defendant's omissions and affirmative representations. Accordingly, Plaintiff and Class Members suffered economic injuries by purchasing the Products.

42.    Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the hazardous nature of the Products. Nonetheless, Defendant concealed that the Products contained or risked containing BPA in order to maximize its own profits.

43.    Although Defendant is in the best position to know the true nature of its Products during the relevant timeframe, to the extent possible, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

44.    **WHO:** Defendant Boba Guys Inc. violated California by, *inter alia*, making material misrepresentations and omissions of fact in the marketing of the Products.

45.    **WHAT:** Defendant made material misrepresentations and omissions of fact by using the Health Claims in the marketing of the Products. Defendant made these claims with respect to the Products even though the Products did not meet the requirements to make such claims. Defendant's misrepresentations and omissions were material because a reasonable consumer would not have purchased or paid as much for the Products if he or she knew that they contained false representations. Furthermore, Defendant omitted, concealed, and/or failed to adequately disclose or warn consumers of the material facts that the Products contained or risked containing hazardous levels of BPA, and that consumption of the Products would therefore expose them to the unreasonable health risks associated with BPA contamination. Defendant was aware of the BPA contamination and associated health risks and, as such, had an affirmative duty to disclose this material information because of the unreasonable health risk associated with such high BPA amounts. Yet, it failed to do so.

46.    **WHEN:** Defendant made material misrepresentations and omissions to Plaintiff and Class Members as detailed herein continuously throughout the Class Period.

47. **WHERE:** Defendant's marketing messages were uniform and pervasive throughout California and the United States, carried through material omissions on the Products' labeling and/or packaging, on Defendant's website, and in its brick-and-mortar shops.

48. **HOW:** Defendant (1) made written misrepresentations regarding the Products by making the false but prominent and uniform Health Claims on its website and in its brick-and-mortar shops; and (2) made material omissions by failing to disclose that its Products contained or risked containing hazardously high levels of toxic BPA by simultaneously, and by failing to warn consumers of the associated severe health risks of exposure to BPA via consumption of the Products despite its affirmative duty to do so.

49. **WHY:** Defendant engaged in the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiff and other reasonable consumers to purchase and/or pay a premium for Products based on the belief that they were healthful in that they were, *inter alia*, "all natural" and "free of artificial ingredients." Defendant profited by selling the Products to likely millions of unsuspecting consumes nationwide.

50. **INJURY:** Plaintiff and Class Members purchased, paid a premium (up to the full price), or otherwise paid more for the Products than they would have if true information and all required warnings had been provided, or alternatively they would not have purchased the Products at all absent Defendant's material misrepresentations and/or omissions.

## **CLASS ALLEGATIONS**

51. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this matter on behalf of himself, and all similarly situated in the following Classes (collectively, the "Classes"):

> ***Nationwide Class.*** All natural persons in the United States who purchased Defendant's milk tea products and all products that contain its brown sugar-based sweetener during the applicable statute of limitations period.

> ***California Subclass.*** All natural persons in the State of California who purchased Defendant's milk tea products and all products that contain its brown sugar-based sweetener during the applicable statute of limitations period.

52.     Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

53.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

54.     **Numerosity.**  Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, Members of the Class and Subclass number in the millions.  The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

55.     **Commonality and Predominance.**  Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include but are not limited to:

    a.  Whether Defendant's Products contained or risked containing BPA;

    b.  Whether Defendant knew that its Products contained or risked containing BPA;

    c.  When Defendant knew the Products were contaminated with high levels of BPA and the steps it took (if any) to mitigate consumers' injuries;

    d.  Whether Defendant had a duty to disclose that its Products contained or risked containing BPA;

    e.  Whether the knowledge of the presence (or risk thereof) of BPA in the Products would be material to a reasonable consumer;

    f.  Whether Plaintiff and the Classes reasonably relied on Defendant's omissions;

    g.  Whether Defendant's conduct alleged herein violates the CLRA, FAL, and UCL;

    h.  Whether Defendant's conduct alleged herein violates the common law;

i.   Whether Plaintiff and the Classes are entitled to damages and/or restitution; and

j.   Whether an injunction is necessary to prevent Defendant from continuing to sell its Products without warning labels for BPA or risk thereof.

56.    **Typicality.**  The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like other Members of the Classes, purchased the Product and Defendant's substantially similar Products in reliance on the representations, omissions, and warranties described above and suffered a loss as a result of that purchase.

57.    **Adequacy.**  Plaintiff is an adequate representative of the Class and the California Subclass because his interests do not conflict with the interests of the Class and the California Subclass Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  Neither Plaintiff, nor Plaintiff's counsel, have any interest adverse to, or in conflict with, the interests of the absent Members of the Classes.  The interests of the Class and the California Subclass Members will be fairly and adequately protected by Plaintiff and her counsel.

58.    **Superiority.**  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

59.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

60.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and Members of the Class and the California Subclass and will likely retain the benefits of its wrongdoing.

61.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA"),
California Civil Code §§ 1750, *et seq.*
(On Behalf of the Nationwide Class and California Subclass)**

62.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

63.     Plaintiff brings this claim individually and on behalf of the Members of the proposed Nationwide Class and California Subclass against Defendant.

64.     Plaintiff and Members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

65.     Defendant's Products are "goods" within the meaning of Cal. Civil Code § 1761(a). The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

66.     The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will continue to result, in damages to Plaintiff and Members of the Class.  These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations deceiving that the Products have characteristics, uses, and/or benefits, which they

do not have, in violation of Cal. Civil Code § 1770(a)(5); (b) Defendant's acts and practices constitute representations that the Products are of a particular standard, quality, or grade, when in fact they are of another, in violation of Cal. Civil Code § 1770(a)(7); and (c) Defendant's acts and practices constitute the advertisement of the Products in question with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

67.    Defendant violated these provisions of the CLRA by: (1) misrepresenting that the Products were healthful in that they were, *inter alia*, "all natural" and "free of artificial ingredients," when in fact they were not; and (2) failing to disclose to consumers or adequately warn them that its Products contained toxic BPAs and of the associated severe health risks of exposure to BPA via consumption of the Products, despite its affirmative duty to do so.

68.    Defendant knew or should have known, through the exercise of reasonable care, that its Products were contaminated with toxic BPAs, and that the Health Claims about the Products were untrue and misleading.

69.    Plaintiff and the Members of the Classes suffered injuries caused by Defendant's CLRA violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's false and misleading promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

70.    Plaintiff, on behalf of himself and all other Members of the proposed Nationwide Class and California Subclass, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

71.    In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant prior to filing this action on February 18, 2025, informing Defendant of his intention to seek monetary damages under California Civil Code § 1750.  The letter, which was sent via certified mail, return receipt requested, and was delivered to Defendant on February 20, 2025, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.

The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated." Accordingly, Plaintiff, individually and on behalf of the proposed California Subclass, seeks monetary damages from Defendant as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

72.    Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled. Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class and Subclass Members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

73.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction—requiring, for instance: (1) adequate disclosure that the Product's are not in fact "all natural" or "free of artificial ingredients"; (2) the removal of such representations; and/or (3) the addition of a warning that the Products contain toxic BPA and explaining the severe health risks associated with exposure to such contaminants—will ensure that Plaintiff is restored to the same position he would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

74.    Accordingly, pursuant to Civ. Code § 1780, Plaintiff and the Classes seek: (a) actual damages in an amount to be determined at trial; (b) an order enjoying Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and the Members of the Classes as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II
### Violation of California's Unfair Competition Law ("UCL"),
### California Business & Professions Code §§ 17200, *et seq.*
### (On Behalf of the Nationwide Class and California Subclass)

75.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

76.     Plaintiff brings this claim individually and on behalf of the Members of the proposed Nationwide Class and California Subclass against Defendant.

77.     Defendant is subject to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.

78.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"  A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by unlawful and/or unfair business practices or acts.

79.     Defendant's misrepresentations and other conduct, described herein, violated the "**unlawful**" prong of the UCL by violating the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as described above, and the California False Advertising Law ("FAL"), Cal. Bus. & Prof Code §§ 17500, *et seq.*, as described below.

80.     Defendant's misrepresentations and other conduct, described herein, violated the "**unfair**" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.  There were reasonably available alternatives to further Defendant's legitimate business interest such as providing a warning label and conducting purity testing of its ingredients.

81.     Defendant violated the "**_fraudulent_**" prong of the UCL by making misrepresentations about the Products at issue that were untrue and misleading, as described herein.  Defendant's conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

82.     Plaintiff and the Members of the Classes lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

83.     Moreover, Defendant's Products pose an unreasonable health hazard because they contained dangerously high levels of BPA, _i.e._, 32,000% over safe amounts.  Accordingly, Defendant had an affirmative duty to consumers to disclose on the Products' labeling and/or packaging that its Products pose a risk of harm.  Yet, Defendant failed to do so.  Plaintiff and Members of the Classes would not have purchased the Products at all or on the same terms had the required warnings been adequately provided.  Thus, on this basis Plaintiff and Members of the Classes also lost money or property as a result of Defendant's UCL violations.

84.     Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class Members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

85.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction—requiring, for instance: (1) adequate disclosure that the Product's are not in fact "all

natural" or "free of artificial ingredients"; (2) the removal of such representations; and/or (3) the addition of a warning that the Products contain toxic BPA and explaining the severe health risks associated with exposure to such contaminants—will ensure that Plaintiff is restored to the same position he would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

86.     Pursuant to California Business & Professions Code Section 17203, Plaintiff and the Class Members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other Class Members; (b) disgorge all revenues obtained as a result of Defendant's violations of the UCL; and (c) pay Plaintiff and the Class Members' attorneys' fees and costs.

## COUNT III
### Violation of California's False Advertising Law ("FAL"), California Business & Professions Code §§ 17500, *et seq.* (On Behalf of the Nationwide Class and California Subclass)

87.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

88.     Plaintiff brings this claim individually and on behalf of the Members of the proposed Nationwide Class and California Subclass against Defendant.

89.     California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

90.     Defendant committed acts of false advertising, as defined by § 17500, by: (1) misrepresenting that the Products were healthful in that they were, *inter alia*, "all natural" and "free

of artificial ingredients," when in fact they were not; and (2) failing to disclose to consumers or adequately warn them that its Products contained toxic BPAs and of the associated severe health risks of exposure to BPA via consumption of the Products, despite its affirmative duty to do so.

91.     Defendant knew or should have known, through the exercise of reasonable care, that its Health Claims about the Products were untrue and misleading.

92.     Further, Defendant knew that its Products contained, or risked containing dangerous levels of BPA, including 32,571.4% BPA above safe levels, yet failed to disclose this fact to consumers.

93.     Defendant's misrepresentations and non-disclosures of the material facts described herein constitute false and misleading advertising and, therefore, constitute a violation of the FAL.

94.     Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

95.     Plaintiff and Members of the Classes lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if the true facts were known about the product; (b) they paid a price premium for the Products due to Defendant's promises and warranties; and (c) the Products do not have the characteristics as promised by Defendant.

96.     As a result of Defendant's wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial.  Plaintiff and the California Class are therefore entitled to restitution as appropriate for this cause of action.

97.     Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class Members can reasonably rely on Defendant's representations as well as

those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

98.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction—requiring, for instance: (1) adequate disclosure that the Product's are not in fact "all natural" or "free of artificial ingredients"; (2) the removal of such representations; and/or (3) the addition of a warning that the Products contain toxic BPA and explaining the severe health risks associated with exposure to such contaminants—will ensure that Plaintiff is restored to the same position he would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent misrepresentations with the full purchase price at their disposal.

99.     Plaintiff and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorney's fees and costs under California Code Civil Procedure Section 1021.5; and other appropriate equitable relief.

## COUNT IV
### Unjust Enrichment / Restitution
### (On Behalf of the Nationwide Class and California Subclass)

100.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

101.     Plaintiff brings this claim individually and on behalf of the Members of the proposed Nationwide Class and California Subclass against Defendant.

102.     To the extent the Court determines it is necessary to do so, this claim is pled in the alternative to the other legal claims alleged in this complaint.

103.     Plaintiff and Class Members conferred benefits on Defendant by purchasing the Products that were purportedly "all natural" and "free of artificial ingredients."  Defendant was and should have been reasonably expected to provide Products that conform with the qualities listed in Defendant's prominent marketing and advertising.

104.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the Members of the Classes.  Defendant was and should have been reasonably expected to provide Products that conform with the qualities as marketed.

105.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class and Subclass Members' purchases of the Products.  Retention of the monies Plaintiff and members of the Classes paid to Defendant for the Products under these circumstances is unjust and inequitable because, at the time of sale, Defendant: (1) misrepresented that the Products are "free of artificial ingredients and created only from the best ingredients[,]" including the purportedly "all natural brown sugar based sweetener" incorporated in "all of [Defendant's] milk teas"[40]; and (2) failed to disclose that the Products contained, or risked containing, dangerously high levels of BPA.  These material misrepresentations regarding the Health Claims and/or omissions regarding BPA contamination and associated health risks caused injuries to Plaintiff and the Class Members because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known and required disclosures had been provided.

106.    Thus, Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class and Subclass Members' purchases of the Products.  Defendant benefited at Plaintiff's and Class Members' expenses when it sold BPA-riddled Products that were inferior to the purportedly healthful Products that Plaintiff and Class Members thought they were actually purchasing, yet the price they paid was the price for a Product that, in fact, was "all natural" and "free of artificial ingredients" (such as BPAs).

107.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the Class Members.

108.    Defendant has thereby profited by retaining the benefit under circumstances that would make it unjust for Defendant to retain the benefit.

---

[40] Boba Guys, *Next Level Quality*, *supra* note 2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

109.    As a proximate result of Defendant's false representations, omissions, and/or concealment of the true qualities of the Products, and as a result of Defendant's resulting ill-gotten gains, benefits, and profits, Defendant has been unjustly enriched at the expense of Plaintiff and Class Members.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiff and Class Members.

110.    There is a direct relationship between Defendant on the one hand, and Plaintiff and Class Members on the other, sufficient to support a claim for unjust enrichment.  Defendant marketed and sold the Products with the false and misleading misrepresentations that they were "free of artificial ingredients" and contained "all natural" brown sugar to improve retail sales, which in turn improved such sales.  Conversely, Defendant knew that disclosure of the true and BPA-riddled nature of the Products would suppress retail sales of the Products, in turn suppressing the demand for the Products, and would negatively impact the reputation of Defendant's brand among Class Members and consumers.

111.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Plaintiff and Class Members are entitled to restitution for their unjust enrichment in the amount of Defendant's ill-gotten gains, benefits, and profits, including interest thereon. Accordingly, Plaintiff seeks, individually and on behalf of members of the proposed Nationwide Class and California Subclass, an order requiring Defendant to disgorge its gains and profits to Plaintiff and Members of the Classes, together with interest, in a manner to be determined by the Court.

112.    Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.  Further, injunctive relief is necessary to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiff and Class Members can reasonably rely on Defendant's representations as well as

those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

113.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price—and an injunction requiring (1) adequate disclosure that the Products contain high levels of BPAs and that, therefore, the Products are not in fact "free of artificial ingredients" and that the brown sugars they contain are not in fact "all natural"; and/or (2) the removal of such representations in Defendant's marketing of the Products—will ensure that Plaintiff is restored to the same place he would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Product absent material misrepresentations and/or in light of all material information (including that the Products contain BPAs), with the full purchase price at their disposal.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.  For an order certifying the proposed Nationwide Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the proposed Class and Subclass;

b.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.  For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief, including disgorgement of revenues and profits wrongfully obtained;

g.  For injunctive relief as pleaded or as the Court may deem proper;

h.  For an order awarding Plaintiff and Members of the Class and Subclasses their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

i.  For such other and further relief as the Court may deem proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: April 1, 2025                                 Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  ___/s/ Julia K. Venditti_____

L. Timothy Fisher (State Bar No. 191626)
Julia K. Venditti (State Bar No. 332688)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            jvenditti@bursor.com
            jwilner@bursor.com
            jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Class*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

I, Julia K. Venditti, declare as follows:

3

1.    I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., and counsel of record for

5

Plaintiff James Totten in this matter.  James Totten alleges that he resides in Hollister, California.  I

6

have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could

7

and would competently testify thereto under oath.

8

2.    The Complaint filed in this action is filed in the proper place for trial under Civil

9

Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

10

in the Northern District of California, as Plaintiff purchased the Products from a brick-and-mortar

11

retail stores located within this District.  Additionally, Defendant advertised, marketed,

12

manufactured, distributed, and/or sold the Products at issue to Plaintiff from this District.

13

I declare under the penalty of perjury under the laws of the State of California and the

14

United States that the foregoing is true and correct and that this declaration was executed at Walnut

15

Creek, California this 1st day of April, 2025.

16

17

_/s/ Julia K. Venditti_

18

Julia K. Venditti

19

20

21

22

23

24

25

26

27

28